# EXHIBIT 2

1    <u>FACT FINDING CONFERENCE</u>

2    Verbatim transcript of the Investigation

3    of the Employment Opportunity

4    Discrimination Complaint of:

5

6    Ruthie L. Windsor

7    Agency Docket No.: ATL04AR0336E

8    June 23, 2004

9

10    <u>APPEARANCES</u>

11

12    <u>Before</u>:

13    Darryl A. Greene, Investigator-

14    Mediator

15    Department of Defense

16    Civilian Personnel Management

17    Service

18    Office of Complaint Investigations

19    Columbia Corporate Park I

20    8850 Stanford Blvd., Suite 3200

21    Columbia, MD  21045-4753

22

23    <u>Complainant</u>:

24    Ms. Ruthie L. Windsor

25

DEFENDANT'S
EXHIBIT NO. 2

CASE NO.
1:05-CV-1196-B

ORIGINAL    Encl

2

1    Complainant's Representative:

2          Deborah Hill Biggers

3          Attorney at Law

4          113 East Northside

5          Tuskegee, Alabama  36083

6

7    Agency Representative:

8          Major Richard Launey

9

10    Witnesses:

11          Ms. Ruthie L. Windsor

12          Lt. Col Keith Darrow

13          Ms. Glenda Sammons (CPAC)

14

15    Certified Court Reporter:

16          Ms. Shanell R. Williams

17

18

19

20

21

22

23

24

25

1           <u>PROCEEDINGS</u>

2

3           THE  INVESTIGATOR:   Let  the

4      record  begin  at  8:32  on  June  23,

5      2004,  in  the  Fact  Finding  Conference

6      discrimination  complaint  filed  by

7      Ms.  Ruthie  Windsor.   This  Agency

8      Docket  Number  is  ATL04AR0336E.

9      I'm  Darryl  Greene,  Investigator

10      of  Office  of  Complaints  of  Investigation

11      Investigation  with  the  Department  of

12      Defense.   In  accordance  with  29CFR1614

13      to  establish  a  record  of  relevant

14      issues  accepted  for  investigation  and

15      provide  an  opportunity  for  the  parties

16      to  present  their  facts  in  the  record.

17           Present  at  this  time  are  the

18      complainant,  Ms.  Ruthie  Windsor;

19      complainant's  rep,  Deborah  Hill

20      Biggers;  agency  rep,  Major  Richard

21      Launey;  Lieutenant  Colonel  Keith

22      Darrow  who  is  the  management  official.

23      He  will  be  present  but  will  be  excused

24      when  other  witnesses  testify.   He  may

25      be  recalled  to  provide  further

1    testimony if new evidence makes it

2    necessary.  Our court reporter is

3    Shanell Williams who will record the

4    verbatim testimony of the proceeding.

5         I will now administer the oath.

6    Please stand and raise your right hand.

7

8         (Witnesses were sworn in at this

9          time.)

10

11        THE INVESTIGATOR:  Off the

12    record.

13

14        (Off-the-record discussion

15         held at this time.)

16

17        THE INVESTIGATOR:  Back on the

18    record.

19        Do you acknowledge that you

20    have read and understand the Privacy

21    Act Notice?

22        MS. WINDSOR:  Yes.

23        LT COLONEL DARROW:  And I do as

24    well.

25        THE INVESTIGATOR:  The notice of

5

1    acceptance dated 21 April 2004 states

2    that Ms. Ruthie Windsor alleges

3    discrimination based on her race, black,

4    and reprisal, and her previous EEO

5    activity when on August 20th, 2002,

6    Ms. Windsor, Lieutenant Colonel Darrow,

7    Director of Tech Support Directorate,

8    U.S. Army Aviation Technical Test Center,

9    and Colonel David Cripps, Commander

10   of the U.S. Army Technical Test

11   Center, did not warrant a promotion.

12       Is that an accurate summary of

13   your complaint?

14       MS. WINDSOR:  That's correct.

15       THE INVESTIGATOR:  For corrective

16   action, what do you want?

17       MS. WINDSOR:  Attorney fees,

18   doctors' visits, postage and handling

19   and -- the mailing, and that's what

20   I'm -- let me read it all.  Immediate

21   career lateral promotion into --

22   a Step 10 for a year with an effective

23   date of 1 May, 1988.  GS-13 Step 10

24   retroactive to 1 May 1989.  Monetary

25   award for receiving a Number 1

1    exceptional for the period 1 November

2    1999 through 31 October 2000.  And

3    that my previous -- be changed to

4    reflect the number awards

5    exceptional with the highest monetary

6    award given for each to have following

7    the periods:  1 November 2000 through

8    31 October 2001; 1 November 2001

9    through 31 October 2002; 1 November

10   2002 through 31 October, 2003.  And I'm

11   asking for a lump sum payment of

12   300,000.  Restored sick leave and

13   annual leave.  And I would like to be

14   reimbursed for unfair dismissal of my

15   EEO complaint.  And that's it right

16   there.

17        THE INVESTIGATOR:  Okay.  Thank

18   you.  In individual complaints of

19   discrimination, it is the

20   complainant's burden to first establish

21   a prima fascia case of discrimination or

22   reprisal.  Once established, the burden

23   shifts to management to articulate --

24   for its actions.  Then the complainant

25   should articulate the reasons given

```
1          were, in fact, discrimination or

2          reprisal.

3               Management has no offer for

4          settlement?

5               MAJOR LAUNEY:  I have confirmed

6          that there is no settlement offer

7          to make on this claim.

8               THE INVESTIGATOR:  Okay.  The

9          first witness is Ms. Ruthie Windsor.

10

11                        * * * *

12

13          EXAMINATION OF RUTHIE L. WINDSOR

14     BY THE INVESTIGATOR:

15          Q    State your name, please.

16          A    Ruthie Lee Windsor.

17          Q    What is your race?

18          A    African American black female.

19          Q    And have you filed or

20     participated in any EEO activity

21     previously?

22          A    Yes.

23          Q    When and what were the claims?

24          A    On or about January of 2000, I

25     filed an EEO complaint due to the
```

8

1    additional duties not being incorporated

2    into my current position description, and I

3    also filed a sexual harassment complaint

4    that was sent up without an investigation

5    and appended to the first complaint.  The

6    sexual harassment complaint was never

7    investigated.  They just sent it up and put

8    it with the first one.

9         Q    Okay.  Please state your title,

10    series, and grade at the time.

11        A    I'm currently working on the

12    title of IT Specialist Land Info Security

13    GS2210, GS-11 -- I mean grade 11.

14        Q    How long have you been in this

15    position?

16        A    Oh, I've been -- well, I've been

17    in the computer career field for 28 years,

18    so it's all computer.

19        Q    How long have you held the GS-11

20    position?

21        A    The GS-11 since 1988 or '89 -- on

22    or about '88 or '89.

23        Q    And what organization are you

24    assigned -- were you assigned at that time?

25        A    At this time?

9

1      Q    At the time of your complaint.

2      A    At the time of the claim, we

3  might have been the U.S. Army Aviation

4  Development Test Activity at that time.

5  I'm not sure, but I can research it and

6  give you that after.  Because it's changed

7  through the years.  It has changed.  Now,

8  we're the Aviation Technical Test Center.

9  But during that time we might have been the

10  Aviation Development Center.

11      Q    Okay.  Provide the names and

12  titles of your first and second level

13  supervisors at the time of the claim.

14      A    At the time of that particular

15  claim, my first level supervisor, if I

16  remember correctly, was Lieutenant Colonel

17  Darrow.  Everything has changed.  And then

18  it could have been Rob Stone.  I think it

19  was Rob Stone.  And he came on board as the

20  director, and he was like the second level

21  supervisor.  "He" meaning Lieutenant

22  Colonel Darrow.  I'm sorry.

23      Q    Okay.  What are the duties and

24  responsibilities of your position at the

25  time of the claim?

```
 1          Q    Why do you believe that?

 2          A    Because I have since -- I have

 3   documentation showing that they did the

 4   same things that they did before.  They

 5   sent two classifications up.

 6          Q    Two position descriptions?

 7          A    One -- this one.

 8          Q    Who is "they"?

 9          A    Colonel Cripps and Darrow, and

10   they're management.  They sent the one up

11   that I provided input to and one up that I

12   did not provide input to.  I have

13   documentation to prove it.

14          Q    Okay.  You're going to provide me

15   with that?

16          A    We will, yes, sir.

17          Q    And what did the documentation

18   say on the record?

19          A    Oh, we was working with a Windsor

20   5 document.  That's what I agreed to with

21   Cripps and Darrow.  Okay?  On the same --

22          Q    What's the Windsor 5?

23          A    It's the document.

24          Q    Oh, it's the document.

25          A    It's the job description.
```

1     Q     Okay.  The job description.

2     A     And on that -- on this particular

3  same day that Colonel Cripps sent the

4  report up to the EEOC or whatever stated

5  that he was in compliance with the report

6  and that everything had been done and that

7  we were in compliance.  On the same day

8  they had a Windsor Tif file sent up and

9  classified.

10    Q     And you believe that was a

11 separate document?

12    A     Yes.  I believe that was a

13 separate document.

14    Q     Did you see that document?

15    A     No.  I'm telling you now I didn't

16 see it.

17    Q     Oh, you didn't see it, but you

18 think it was different from the original

19 version --

20    A     Most definitely I believe that it

21 was different.

22    Q     Now, do you believe others were

23 treated more favorably regarding this

24 matter, meaning were others given the

25 opportunity for promotion or promoted in

```
 1  be higher than a GS-11, is my belief.

 2         Q    What was your performance rating,

 3  if you remember, in 2002 -- that year?

 4         A    Let me give you some history

 5  there.  Okay.  Prior to, even during the

 6  year that I filed the complaint against

 7  Larry Martin, I got a 1.  Since -- okay.

 8  Let me finish.  Since Lieutenant Colonel

 9  Darrow has become my second level

10  supervisor, I got a 2.  It was lowered.  I

11  questioned him about it:  Why did my

12  performance rating drop from a 1 to a 2.

13  He said he didn't know.  Until this day he

14  hasn't given me a legitimate reason for

15  lowering my performance grade.

16         Q    Now, in the performance -- how is

17  your performance appraisal done?  A 1 is?

18         A    Is exceptional.

19         Q    And 2 is what?

20         A    Next to whatever is --

21         Q    And what's satisfactory?

22         A    I guess a 3.  I'm not sure, but I

23  do know a 1 is exceptional.

24         Q    A 3 is satisfactory, and 1 is the

25  highest?
```

1       Q    Okay.  All right.  Ms. Windsor,

2  you also have testified that another reason

3  that you feel that you have been

4  discriminated against by the agency in

5  regard to the classification on your job

6  description is that you believe that there

7  were two files sent to CPAC for

8  classification; is that correct?

9       A    That's correct.

10      Q    And what were the names of those

11 two different files that were sent for

12 classification?

13      A    Windsor 5 Doc and a Windsor Tif

14 file.

15

16           THE INVESTIGATOR:  Now, the

17      Windsor 5 Doc you saw?

18           THE WITNESS:  Yes.

19           THE INVESTIGATOR:  The Windsor

20      Tif file you didn't see?

21           THE WITNESS:  Uh-uh.

22           THE INVESTIGATOR:  So you

23      don't know if it was sent -- you know

24      it was sent, but you don't know if

25      it was the same document or not.

44

1     But you suspected that it may be?

2          THE WITNESS:  Yes.  It's my

3     belief, yes.

4          THE INVESTIGATOR:  So you

5     suspect that it's a different

6     document than what was sent -- the

7     other document, that Windsor 5?

8          THE WITNESS:  Yes.  Yes.  It is

9     my belief that it was a different

10    document.

11         THE INVESTIGATOR:  Now, why do

12    you believe it's a different document,

13    and why do you think they changed it?

14         THE WITNESS:  I can see what's

15    in front of me.  I've been working

16    with the Windsor 5 document.  That's

17    what I've been working with.

18         THE INVESTIGATOR:  And that's not

19    the document that was --

20         THE WITNESS:  Yes.  The Windsor 5,

21    yes, it is.

22         THE INVESTIGATOR:  That is the

23    one, the Windsor 5.  The Windsor.tif is

24    the one --

25         THE WITNESS:  That I did not have

```
 1            any input to.
 2                 THE INVESTIGATOR:  Okay.  Now,
 3            the Windsor 5 you had input in and
 4            that's the job that you're on now?
 5                 THE WITNESS:  Yes, sir.
 6                 THE INVESTIGATOR:  You have a
 7            problem with that, right, or you don't
 8            have a problem with that position
 9            description?
10                 THE WITNESS:  Yes.  I have a
11            problem with it, because I don't
12            believe it was graded out accurately.
13                 THE INVESTIGATOR:  Personnel
14            graded the -- classified that job,
15            right?
16                 THE WITNESS:  CPOC.
17                 THE INVESTIGATOR:  Yeah.
18            Management in the negotiated settlement
19            agreement, from what you told me
20            before, agreed that once you discussed
21            with management the duties that you
22            believed it would be sent to personnel
23            and they would classify the job?
24                 THE WITNESS:  That's right.
25                 THE INVESTIGATOR:  They
```

1        classified the job?

2              THE WITNESS:  That's correct.

3              THE INVESTIGATOR:  You don't

4        agree with the classification of

5        the job?  That's what you're

6        saying?

7              THE WITNESS:  If that's what

8        I'm saying, yes.

9              THE INVESTIGATOR:  I'm asking

10       is that what you're saying.  So

11       you're saying that you don't agree

12       with the classification of the job

13       that --

14             THE WITNESS:  Yes.  I don't.

15       I don't agree with the classification

16       of the job.

17             THE INVESTIGATOR:  Okay.  And this

18       is the -- and this is the position

19       description that you conferred with

20       management on?

21             THE WITNESS:  Yes.

22             THE INVESTIGATOR:  The factors

23       that management assigned duties that was

24       -- management admits that they did not

25       share the factors for the job

```
 1        description -- factor level descriptions

 2        and the position description -- position

 3        description as a major responsibility.

 4        That's like a narrative that -- talking

 5        about the general -- and the factor

 6        level descriptions that personnel needed

 7        to grade out the different -- the different

 8        factors to get a grade appointed for

 9        particular responsibilities, like scope

10        of the job.  And you didn't get to see

11        that portion?

12             THE WITNESS:  No.  The main issue,

13        according to the negotiated settlement

14        agreement, was that whatever job that

15        went up for classification I would be

16        provided an opportunity to provide

17        input.  That did not happen, because we

18        worked with the Windsor 5.  That's

19        the one I worked with management on.

20             THE INVESTIGATOR:  And that was

21        sent up?

22             THE WITNESS:  Yeah.

23             THE INVESTIGATOR:  And that was

24        classified?

25             THE WITNESS:  Exactly.  But
```

1    management also sent another file up,

2    Windsor Tif, that they did not provide

3    me that opportunity, but they should

4    have.

5         THE INVESTIGATOR:  But are you

6    on that Windsor Tif --

7         THE WITNESS:  I haven't seen it.

8    I've been trying to get it.

9         THE INVESTIGATOR:  But the

10   Windsor 5 you did have -- you

11   conferred with management on?

12        THE WITNESS:  Exactly.

13        THE INVESTIGATOR:  Personnel

14   classified -- and you have a

15   question about that grade, the

16   GS-11 that personnel classified?

17        THE WITNESS:  Uh-huh.  And I'm

18   also trying to find -- see, I was not

19   physically provided the opportunity

20   to provide input for the classification.

21   The one that we worked on was not the

22   only one that they sent up for

23   classification.

24        THE INVESTIGATOR:  But that was

25   the only one that came back --

```
 1              THE WITNESS:  The Windsor Tif

 2         -- I don't know.  The Windsor Tif

 3         came back.  Somebody got it.

 4              THE INVESTIGATOR:  But the 5

 5         -- the Windsor 5 is the position

 6         description that --

 7              THE WITNESS:  Yes.

 8              THE INVESTIGATOR:  That's the

 9         one that you conferred on and they

10         classified a GS-11, right?

11              THE WITNESS:  Uh-huh.

12              THE INVESTIGATOR:  You have

13         to answer out loud.

14              THE WITNESS:  Yes.  I'm sorry.

15              THE INVESTIGATOR:  Okay.

16         Ms. Biggers, do you have

17         any more questions?

18              MS. BIGGERS:  Well, I just want

19         to get some clarification.

20

21         EXAMINATION OF RUTHIE L. WINDSOR

22    RESUMED BY MS. BIGGERS:

23         Q    You did not see the factors that

24    went with the job description on the

25    Windsor.5 document?
```

1    Windsor Tif file.  I've been asking FOIA.

2    I've went to Rosaline.

3

4              MAJOR LAUNEY:  Do you have any

5         documents that talk about the

6         Windsor Tif file?

7              THE WITNESS:  Yes.  I most

8         certainly do.

9

10        Q    Let me just ask this question:

11   Is it your position that since the Windsor

12   Tif file was sent up around the same time

13   that the Windsor.5 doc file was sent up --

14   is it your position that the Windsor Tif

15   influenced the results or the

16   classification of the Windsor.5?

17        A    I would say so.  Because on that

18   same date, Colonel Cripps did his

19   compliance report, 3 June 2002, saying that

20   he was in compliance and that the position

21   description that we used was the Windsor.5.

22   On that same day Rosaline Taylor --

23        Q    That's a personnel person?

24        A    -- sent the Windsor Tif file up,

25   asked for a classification and that the

```
 1        A     Yes.

 2        Q     And if this goes too long and you

 3    need a break, if you would, please indicate

 4    to us, and I'm sure you would be allowed to

 5    take a break.  Is that okay?

 6        A     That's fine.

 7        Q     Do you have any medical

 8    conditions or any problems that are causing

 9    you difficulty understanding or answering

10    any questions here today?

11        A     No.

12        Q     I want to show you a document

13    that is entitled Position Description IT

14    Specialist GS2210, GS-11, and see if you

15    recognize that document.

16        A     Yes, I do.

17        Q     Okay.

18        A     The same number as the one I'm

19    assigned to.

20        Q     Okay.  If you would, take a

21    minute.  What I would like you to do is to

22    ensure for me that this is, first of all,

23    the document -- the position description

24    that you're currently working under.

25
```

56

```
 1              MAJOR LAUNEY:  And, sir, I would

 2         ask that if we need to take a break

 3         to allow her to thoroughly look at

 4         that, I think that's important.

 5              THE INVESTIGATOR:  Let's have a

 6         break.  Off the record.

 7

 8              (A break was taken at this time.)

 9

10              THE INVESTIGATOR:  We're back on

11         the record at 9:44.  We were off the

12         record for the complainant and

13         complainant's rep to review the

14         position descriptions submitted by

15         agency counsel.

16              Do you have questions?

17              MAJOR LAUNEY:  Yes.  Thank you.

18

19         Q    Ms. Windsor, you have compared

20    the document -- I have just given you the

21    document of the position description

22    document that you referred to as Windsor 5?

23         A    Yes.

24

25              MAJOR LAUNEY:  And this Windsor 5
```

1      is going to be attached to the record

2      here?

3           THE INVESTIGATOR:  Yes.

4

5      Q     And are they the same?

6      A     Yes.

7      Q     And the position description that

8  you have read accurately describes your

9  position that you're working under right

10  now; is that correct?

11      A     That's correct.

12      Q     And it's correct to say that you

13  had the proper input into Windsor 5 that

14  was required under the settlement

15  agreement?

16      A     Right.  The position description,

17  yes.

18      Q     And that procedure in which you

19  had input in the submission of Windsor 5

20  you have no complaints over, as it relates

21  to Windsor 5?

22      A     Windsor 5.

23      Q     And the position description that

24  you're currently working is accurately

25  reflected in the position description?

58

```
 1        A    Yeah.   The position descriptions
 2   are the same.
 3        Q    Okay.   Now, under the settlement
 4   agreement, it was CPOC's responsibility to
 5   do the classification; is that correct?
 6        A    That's correct.
 7        Q    And from -- and Colonel Darrow
 8   and Colonel Cripps had no role in the
 9   classification decision at CPOC; is that
10   correct?
11        A    As far as I know.
12        Q    Now, I am not a computer expert.
13   You have worked with computers for how
14   long?
15        A    28 years.
16        Q    Okay.   My understanding is -- and
17   I may get this wrong, so correct me.   If
18   you have something named -- a document
19   named .doc, that's a Word or Word Perfect
20   document usually?
21        A    A Word Perfect?
22        Q    Well, what's the difference when
23   you have a document that is labeled doc and
24   a document that's labeled tif?
25        A    The .doc -- and the .tif is an
```

```
 1    extension.

 2         Q    And what is the meaning usually

 3    between those two?

 4         A    Well, one might be -- like you

 5    say "save" -- the different formats.

 6         Q    And isn't it normally that a

 7    document labeled .doc would be in a Word

 8    format?  And if something's in a Word

 9    format, if you e-mail it to me, I can

10    change those words, right?  I can make

11    changes?

12         A    You can change the contents too.

13         Q    Right.  If you send me a document

14    in the doc form, I can manipulate the

15    language on that form, correct?

16         A    Yes.  Exactly.

17         Q    Okay.  And a tif format is a

18    photocopy, for the lack of a better word.

19    It's a picture.  It's an image of the

20    document, correct?

21         A    Exactly.

22         Q    And if that's e-mailed, you can't

23    change the wording on that document

24    anymore; is that correct?

25         A    That's correct.
```

60

```
 1        Q    So if what was submitted to

 2   CPAC and what was -- to CPOC -- excuse me.

 3   If the Windsor 5 document was copied

 4   electronically, put into digital form, and

 5   submitted to CPOC, it would be in

 6   electronic digital format.  As in an

 7   electronic copy, it would be sent in a Tif

 8   file, wouldn't it?

 9        A    Exactly.

10        Q    And that couldn't be changed,

11   could it?

12        A    Exactly.

13        Q    So there would be even more

14   protection to make sure if tif -- if

15   Windsor Tif is a copy of Windsor 5, that

16   would be even more protection that it

17   couldn't be changed; isn't that correct?

18        A    Exactly.

19        Q    And you have not seen or you

20   don't know what Windsor Tif is?

21        A    That's right.  I don't know.

22        Q    But as far as a comparison

23   between Windsor 5 which you said was -- and

24   your position description, they're the

25   same?
```

61

```
1        A    Right.  From what I just
2    compared, they're the same.
3        Q    And other than the Windsor Tif
4    concern that you've expressed, you have no
5    other evidence or no other allegations of
6    wrongdoing by anyone in the agency
7    regarding your position description?
8        A    You know it's ironic that they
9    could be the same in the -- and the tif
10   would be just a way to provide protection.
11   Why wasn't I able to get a firm answer?
12       Q    Okay.  But my question is, other
13   than the tif document -- was it the tif
14   versus doc or the Windsor submissions --
15   that's the only facts you have to support
16   your claim that there has been some
17   discrimination based upon your
18   classification description; is that
19   correct?
20       A    That and these other duties that
21   we went through.  The duties that we just
22   --
23       Q    Okay.  And so the other duties
24   that you referred to, but you're saying
25   your position description was accurate from
```

1    -- that's what you said.

2         A    What we described and agreed to,

3    it matched.

4         Q    Okay.  Now, you've never gotten

5    an unsatisfactory rating; is that correct?

6         A    Well, he lowered my performance

7    rating for no reason at all, just because

8    he could -- Lieutenant Colonel Darrow.

9         Q    Okay.  My question was, did you

10   ever get an unsatisfactory rating.

11        A    What would you call an

12   unsatisfactory rating?

13        Q    A rating below satisfactory.

14        A    And satisfactory being 1, 2, or

15   3?

16        Q    Well, you've talked about them --

17   if 3 is average, okay, and 4 is

18   satisfactory, okay --

19        A    Below 3?

20        Q    Yes.

21        A    No.  I've never gotten a

22   rating below 3.

23        Q    And if you have a rating that's a

24   2, that's a higher performance -- you're in

25   a superior performance rating; is that

 1    correct?

 2         A    Well, yes.  You're higher.

 3         Q    I don't know.  Pardon my

 4    ignorance on that, but I'm not familiar

 5    with what the numbers exactly match to, but

 6    I am correct to say that that is a more

 7    than successful rating; is that correct?

 8         A    Yes.

 9         Q    Okay.  And you've provided all

10    the evidence that you have regarding the --

11    any potential damages that you've suffered

12    already in the document that you submitted?

13    That was all that you had?

14         A    (Witness nods head.)

15         Q    Okay.  And that's all the

16    documents that you have in support of that,

17    correct -- all the evidence that you have

18    in support of those damages?

19         A    In support of them?

20         Q    Yes, ma'am.

21         A    Yes.

22

23              MAJOR LAUNEY:  I want to

24         have a second.

25              THE INVESTIGATOR:  Off the

1          record.

2

3                (Off the record at this time.)

4

5                THE INVESTIGATOR:  Let's go

6          back on.

7

8          Q    Ms. Windsor, that's all I have.

9     Thank you very much.

10

11               LT. COLONEL DARROW:  No.  I don't

12          have any questions.

13               THE INVESTIGATOR:  Well, I have

14          some questions for Lieutenant Colonel

15          Darrow.

16

17          EXAMINATION OF LT. COLONEL DARROW

18     BY THE INVESTIGATOR:

19          Q    Please state your full name.

20          A    My name is Keith Roberson Darrow.

21          Q    And what is your race?

22          A    Caucasian.

23          Q    And what is your organizational

24     relationship to Ms. Windsor?

25          A    Since May of 2002, I've been

1   assigned as the Director of the Test

2   Support Directorate out at ATTC.  And for a

3   short time following my reassignment to

4   that directorate, I was Ms. Windsor's

5   immediate supervisor.  And then following

6   the hiring for the division chief position,

7   that individual because my immediate

8   supervisor, and I have since served as her

9   senior rater.  And I would believe that we

10  effected that change in January or February

11  of 2003.

12      Q    Okay.  What are the complainant's

13  job responsibilities?

14      A    I would refer you to the position

15  description that's already apparently a

16  part of the record.

17      Q    She's the IT Specialist GS2210,

18  GS-11, Computer Specialist?

19      A    That's correct.  Information

20  Technology with a focus, if you will, on

21  Information Security.

22      Q    Information security.  And who

23  assigns her work?

24      A    Her supervisor and I are the ones

25  who determine what her duties should be.

 1   that position in personnel?

 2        A    I don't.  Although I have a vague

 3   recollection of seeing a photocopy of that

 4   e-mail that came back on the 2nd of July,

 5   2002, and I think somebody named Trish sent

 6   an e-mail.  Well, there you go --

 7   classified by Trish Hicks at the South

 8   Central CPOC -- which at that time may have

 9   been at Fort Benning, but at some point

10   they moved to Huntsville.

11        Q    Have you ever talked to --

12        A    Management doesn't have any

13   interaction with those folks at civilian

14   personnel.  Everything we do is through

15   the local folks here at CPAC.

16        Q    Are there --

17        A    You know what?  I need to take

18   that back.  I just said management doesn't

19   have any interaction.  Recently -- and this

20   is a new thing.  On another position

21   description, somebody from CPOC did send me

22   a correspondence.  At this time I certainly

23   did not have any contact with the CPOC

24   folks and have never had any contact with

25   CPOC until on this particular position

1    description.

2       Q    So once you and Ms. Windsor or

3    management discussed this position

4    description, it went up to

5    classification -- I mean to personnel and

6    someone classified the job and brought it

7    back to --

8       A    That's exactly right.  From

9    management's perspective, it went into a

10   dark hole somewhere, and then we didn't see

11   it again, had no interaction with the PD

12   until it popped out on the 2nd of July.

13      Q    Ms. Windsor believes that her

14   race and the fact that she participated in

15   a previous EEO complaint was a factor in

16   her -- in your decision not to promote her.

17   How do you feel about that?

18      A    I am extremely hurt by that.  I

19   think it's a hurtful accusation.  It's

20   completely untrue.  It's preposterous.  I

21   think she knows that that is simply not in

22   my character.  And I regret that Colonel

23   Cripps couldn't be here today in person.

24   He is a compassionate person who would

25   never do such a thing.  And so I -- I

1        Q    Could you just look at that

2    document and tell me if there were

3    evaluations attached to that?

4        A    No, ma'am, I can't, not unless

5    it's in here.

6        Q    Well, that was what my question.

7    Was --

8        A    The evaluation is not reflected,

9    but it does have a statement here.

10       Q    Now, that document that I just

11   handed you, on the front it says it was

12   classified by Fort Rucker, I believe?

13       A    DCA:  Fort Rucker.

14       Q    What does that mean?

15       A    Delegated Classification

16   Authority.

17       Q    What does that mean?  What does

18   that Fort Rucker DCA mean?

19       A    This terms means that Fort Rucker

20   has the delegation classification

21   authority.  That's a standard statement.

22       Q    So does that mean that Fort

23   Rucker has the authority to do the

24   classification on that job position?

25       A    Fort -- the DCA at Fort Rucker

1  has the authority to classify positions,

2  which they do the position and their

3  evaluation.  The final say so on whether

4  it's classified correctly rests with CPOC.

5  That's when, if they disagree, they come

6  back with an advisory.

7     Q    Now, so the -- on the document

8  that I gave you, it had Fort Rucker DCA.

9  Would Fort Rucker have done an initial

10  classification of that position before it

11  went to CPOC?

12     A    They would have done their

13  classifications of the duties and an

14  evaluation.

15

16          MAJOR LAUNEY:  Let me -- because

17      I think we need to be fair most of all

18      to the system.  My understanding is

19      that the Fort Rucker DCA that was

20      found on this particular case -- but

21      that the actual classification was

22      done by Trish Hicks and because of a

23      typographical error when it was

24      first submitted, it had Fort Rucker

25      DCA.

```
 1   there?

 2        A    Transmitted electronically.

 3        Q    Okay.  When -- and I would assume

 4   that the position description would be an

 5   attachment -- electronic attachment to an

 6   e-mail?

 7        A    It would be electronically

 8   attached to an RPA.

 9        Q    To the RPA.  Okay.  Do y'all

10   submit Word documents, or do you submit

11   scanned copies of a document?

12        A    It depends on who's doing -- who

13   the POC is and how they attach it.

14        Q    It could be either way?

15        A    The preferred way is --

16        Q    Okay.  Or it could be what we

17   call a Tif file where you have Windsor,

18   dot, t-i-f?

19        A    It could be scanned.

20        Q    And that's what a Tif file is?

21        A    Tif is a scanned file.

22        Q    So you just take a Word document

23   and you electronically turn it into an

24   electronic copy; is that correct?

25        A    Well, you can attach it from --
```

1    directly from a Word file.  Like if you

2    needed it in Microsoft Word and you saved

3    it, you could attach that Word document.

4        Q    Or you could make a scanned copy

5    of the document?

6        A    Or you could take that document

7    and scan it and attach it.

8        Q    And there's no difference to the

9    contents of those two documents; is that

10   correct?

11       A    No.

12       Q    One's just a scanned copy of the

13   Word document?

14       A    Correct.

15       Q    That's all I have.

16

17            THE INVESTIGATOR:  Thank you, Ms.

18       Sammons.

19            MS. SAMMONS:  You're welcome.

20            THE INVESTIGATOR:  Off the record.

21

22            END OF PROCEEDINGS.

23

24

25

1   STATE OF ALABAMA

2   HOUSTON COUNTY

3       I, Shanell R. Williams, Court Reporter

4   and Notary Public, State at Large, do hereby

5   certify that the foregoing transcript, pages

6   1 through 131 is a true and correct transcript

7   of the testimony and proceedings taken at

8   said time and place; and that the same was

9   taken down by me in stenograph shorthand,

10  and transcribed by me personally or under

11  my personal supervision.

12      I further certify that I have no

13  interest in this matter, financial or

14  otherwise, or how it may develop or what

15  its outcome may be.  I further certify

16  that I am not of counsel for any of the

17  parties, nor am I related to counsel or

18  litigants or associated with anyone

19  connected with this cause, to my

20  knowledge.

21      Witness my hand this 13th day of July,

22  2004.

23  *Shanell R. Williams*

        Shanell R. Williams,
24      Court Reporter and
        Notary Public
25